May I please the court. My name is Jerry Fong. I'm the attorney for appellant Richard Taylor. We're here to ask the court to reverse the district court's grant of the motion for summary judgment by the United States. It is clear in this case that the United States government was and is the landowner of the golf course at Moffett Air Force Field. And it is clear that the United States, through its golf course management people, asked Mr. Taylor, the appellant, who was a regular golfer at Moffett Golf Course, to do the United States a favor. Volunteer his services as a retired tree cutter to help cut down some of the trees. Why? Because there was not enough money in the budget for them to go out and hire a professional tree cutter, an unretired professional tree cutter. It is also clear that by asking Mr. Taylor to do this, the United States government got a benefit, a benefit of a retired tree cutter who was doing this in exchange for a round or two of free golf, but basically because he cared about the golf course. Now, why those facts are important, Your Honors, is that that put the United States in the position, under California primary assumption of risk law. It was the landowner, the sponsor, the invitor, and the beneficiary of what Mr. Taylor did. And as such, it had certain duties that it cannot wash its hands of. One of those, and it's set forth in our briefs, is that it cannot increase the risk that is inherent in a dangerous activity. And let's not debate for purposes of today whether or not tree cutting is per se a dangerous activity. Let's assume for argument's sake that it is. But the California law on primary assumption of risk is very, very clear. The inquiry does not stop simply at the door of finding out that, yes, this is a dangerous activity. But the relationship of the parties really, really does matter. And in this case, as a sponsor, as the landowner, and as the beneficiary of what Mr. Taylor did, and as the invitor to get Mr. Taylor onto the property, the United States government had a duty that it could not have surrendered, it could not have given away, it could not have wished away, which was not to increase the danger inherent in tree cutting. And, of course, the danger inherent in tree cutting is that a person might fall off the tree. However, for purposes of the summary judgment motion, there was evidence submitted, and it was not rebutted, quite frankly, but I suppose that's neither here nor there. All we have to show is that there was evidence submitted on behalf of Mr. Taylor that he had previously asked the golf course management group to supply him with what we commonly call a cherry picker, a mechanical lift, one of the things that we see that PG&E has all the time. What case says that that's called increasing the danger? The increasing the danger? We cited the hydration case, I know, but that's different. If the person had asked up front in the race, should, are you going to supply water, they'd say, nope, we don't supply water. But that wasn't the case. But, Your Honor? And the race, the case of the stunt woman, if she had said up front, are you going to make it go faster, it might have made a difference, but they didn't tell her they were going to make it go faster. Here he clearly knew that if I do this, they aren't going to give me a lift. Now, which case says that that's increasing the risk? In this area. The landmark case of night, but more importantly, the landmark case of night, but more importantly, more specifically, the case of Morgan versus, I think it's Fiji or Fuji Country Club. In the Morgan case, the golfer who was injured by the country club's removal of trees which had served as barriers between the fourth and the fifth course, he had been a regular golfer there. He knew the barriers had been removed, and he still continued to play golf. And what the court of appeals held is that it doesn't matter, because Fuji, as the country club owner, had a duty not to increase the risk inherent in the sport of golf, which would be, of course, getting hit by air and golf balls. But because Fuji, the land owner, the invitor, and the beneficiary, presumably, of the members or the golfers paying dues and whatnot, had a duty not to increase that risk, and by taking down the barriers, it had increased that risk, even though the plaintiff in that case had known that the barriers had been taken down. So if this case goes back to the trial judge, do you try it on the basis of pure comparative negligence, comparative assumption of risk? Absolutely, Your Honor. This is a classic example of what the landmark case of Knight is talking about. That is to say, the subjective knowledge and, if you will, willingness of the plaintiff to go ahead and partake in the activity, the dangerous activity, even in light of the defendant's misconduct, simply kicks it into a secondary assumption of risk situation, which would be comparative. And we have said along that this is a comparative case. But that is not a basis for granting summary judgment and tossing Mr. Taylor's case out of court. And, in fact, the district court gave two reasons, in essence, two principles of law, as to why it granted summary judgment. One we just touched on, which was that, hey, but Mr. Taylor knew before he went to cut that tree, that issue from which he fell, he knew that the management company or the golf course management had refused on prior occasions to provide him with the lift that he thought would be necessary for him to cut the tree safely. Well, but Knight and Morgan and Sappro, the Marathon case, they are all, they're clear. The fact that the plaintiff might have made a mistake in going forward in light of and in clear knowledge of the defendant's breach of his duty of increasing the risk that is inherent in the activity does not make it a primary assumption of risk case. It simply kicks it into a comparative situation. That's where the district court made its error. And, also, the district court made the error by finding, without any evidence, but simply concluding that Mr. Taylor was more knowledgeable than the United States of America in terms of I think he was pretty knowledgeable, obviously. It was his career. I mean, it seems to me, even if the case goes back, you have a pretty tough argument to make on the, that he didn't assume a fair amount of risk in this case. And it's a great comparative case. And I'm sure the United States attorney's office will do a wonderful job in convincing the jury that the United States government have absolutely no responsibility to provide a mechanical lift when this volunteer who was doing this on behalf of the government to benefit the government so they could save a couple of dollars was 100 percent comparatively negligent. But that's for another day. What we are here for is the fact that it doesn't matter that Mr. Taylor was, quote-unquote, knowledgeable, because as the landowner, you cannot say, you cannot simply say, well, I'm inviting this person onto my property, say, I invite Mark Spitz, I'm dating myself, but I'm saying Mark Spitz instead of Michael Phelps, to my backyard pool. But because Mark Spitz is a great swimmer, I don't have any more responsibility. That's not true. As the landowner, as the invitor, and as the party benefiting from inviting somebody onto your property, you cannot make the activity that you're asking your guest to engage in on your property any more dangerous than what was inherent. For example, a very good example in this case is that the United States certainly is not contending and cannot contend that it could somehow, because Mr. Taylor was more, quote-unquote, knowledgeable, hey, we could wash our hands completely. Is the United States now saying that, yeah, we could do that, because if Mr. Taylor had chosen to use firebombs to get rid of the trees, if he decided to, in essence, nuke the entire golf course to get rid of the trees, that the United States could say, well, that's fine, that's his decision, because you know what? He is a retired professional tree cutter. We wash our hands of this. That's just not common sense. And it's the reason it's not common sense is that, again, the landowner had a nondelegable duty not to increase the harm. And that's set forth in this section on the nondelegable duty, including the Wal-Mart case. It is something that the United States cannot get rid of simply by declaring unilaterally, well, the invitee is more knowledgeable than we are. I think we have your argument at hand. Do you want to save some time for rebuttal?  Thank you, Your Honor. Ms. Cormier. Good morning. May it please the Court. My name is Claire Cormier. I'm an assistant United States attorney, and I represent the United States of America in this case. I'd like to start with the issue of increasing the risk. The United States has never stated that it didn't have an obligation not to increase the risk. That's on page 17 of our brief. What the distinction here is that under the Avila case by the California Supreme Court in 2006, while there is a duty not to increase the risk if you have a relationship with the activity and the other party, you don't have a duty to decrease the risk. Now, Mr. Taylor, on occasion, had asked for a mechanical lift. He did not ask for one the day of the accident. He has not stated that it's always necessary. Perhaps providing a mechanical lift would have decreased the risk, but under the Avila case, it says explicitly in that case that there is not an obligation to decrease the risk. Now, Mr. Fong admitted that falling is an inherent risk in tree trimming. That risk was there the first time Mr. Taylor trimmed a tree on the golf course, and it remained the same risk on the day of the accident. By not providing a mechanical lift, that merely did not decrease the risk. What do we say about the golf course tree issue? The Morgan case? Yes, exactly. Again, that is a situation of the golf course, in that instance, increasing the risk. There had been trees that made it less likely for an errant ball to hit a golfer. They removed those trees, and therefore, the risk was increased. In addition, the Morgan case. On your theory, how long would that last? I'm sorry. I don't. Well, a golf course could always, you could put the thing in a forest, and there would be lots of trees that interfered with balls. You could make the fairways only three feet wide so that you wouldn't take out too many trees, and that would help people on the other three-foot-wide fairway, et cetera, et cetera. So suppose they'd opened up a golf course without trees separating. In that instance, under the Morgan. Then what? Under the Morgan case, if that were the last word on the subject, that would go into the category of sports cases where there's an obligation to have a reasonably safe facility. However, the Avila case, and Morgan was a California appellate case in 1995. In 2006, the California Supreme Court has stated in the Avila case that there is, quote, not a duty to decrease the risks. So I believe to the extent that you could read Morgan as requiring a safe facility, again, you look to the relationship of the parties here. And in that case, it's a participant. The relationship of the parties is quite important in the Knight analysis. And in Morgan, it was a regular participant in the golf game. If you have no relationship whatsoever, then you fall within the Parsons case, which is the garbage truck that spooked the horse. And in that case, there was no relationship between the garbage truck and the horse rider. And in that case, the Court found that because there was no relationship between the parties, there was not even a duty not to increase the risk. How about the dog bite case? There are several. Well, the veterinarian who is a volunteer has no relationship whatsoever with the owners of the dog. In that case. He gets bitten when he comes to take care of an injured dog on the roadway. In that case, the lack of the relationship between the parties is instructive because that is not the purpose of the plaintiff being there. Yes, he had some expertise in dog-related issues, but there wasn't a relationship, there wasn't an agreement between the parties. In the occupation cases, the firefighters, the veterinarians, the shark handlers, et cetera, once you engage someone for the very purpose of dealing with the dangerous activity, and the person accepts that, reasonably or unreasonably, whether or not they have subjective knowledge that supports it, once they accept that engagement, they accept the risk. And that's in the Preeby case, which is the veterinarian. That is the firefighter cases, both volunteer and paid. Also, it can go outside the employment context. For example, in the Saville case where somebody was ---- If suppose you don't engage them. If Mr. Taylor had been at the golf course to play golf, without being ---- I'm talking about ---- I'm trying to get a fix on California law, which seems to me is messy, to say the least. The veterinarian wasn't engaged, true, to do it. If that's all it takes, who says I engage a firefighter? My place is burning down, the fire engine. I don't call them to come. Maybe I like it burning down. My gosh, it's accidentally burning down, and I'm going to collect a bunch of insurance. I don't want those idiots there messing around with my place, so I'm not engaging them. I think in that circumstance, the public is engaging them, and they are public employees. The case of the ---- again, going back to the case of the dog breeder, I think it was, who came across the injured dog and was bitten, that would be analogous to Mr. Taylor coming to play golf at the golf course. And while he's playing golf, he happens to see a tree branch that needs some attention and takes it upon himself, because of his expertise, as the dog breeder did, to try to remedy the situation. You would agree that the United States had a degree of control over his activities, wouldn't you? A minor degree of control. Well, let's say he wanted to go caddyshack on him and blow up the tree. The United States would not allow that, right? We would not allow that, and had he injured someone else doing that, that would be where that non-delegable duty issue comes in. Right. In other words, there were certain parameters of control that the United States exercised over this volunteer. They wanted him to trim the trees. They didn't want him to do other things, right? That's true. And to the extent that they allowed him to come on the property, they were controlling the conditions of his employment, volunteer as it was, right? Well, only to a certain extent. He's really more in the nature of an independent contractor, because he is choosing the manner in which he is doing the tasks. He was not ever directed, and there's testimony in his deposition on this subject, he was not directed how to do it, he was not told what equipment to use. He chose the method of dealing with each tree because he held himself out as having the expertise. So he chose the method of using a cherry picker and asked the person who gave him the independent contract for the cherry picker, and they said no. So how is he supposed to complete the task if he, in his professional judgment, decides it can't be done safely without using a cherry picker? In his professional judgment, he thought it could not be done safely. He had no obligation to do it. He could have walked away. And where in the record does it say that? He was asked to do these tasks. He volunteered. Right. He asked to do them. He volunteered. But I don't see anything in the record saying if you don't think it's safe, you shouldn't do that. That is why you retain somebody who holds himself out as an expert. Yes. And the expert says I need a cherry picker. And then if the expert thought that it still could not be done, he should have walked away, particularly in this instance where he's a volunteer. Right. I don't think there's an explicit argument. But what I'm interested in is where is that in the record, one way or the other? There's not an explicit statement in the record where someone has said, Mr. Taylor, if you think this tree can't be done, you don't need to do it. But there's certainly nothing in the record to the contrary indicating that he was forced in any way to do these tasks. Not forced. I mean, as we draw the inferences in favor of the plaintiff at this stage, we're not at trial, so we don't have to resolve them. His best case scenario, it seems to me, is to say I made the judgment I needed a cherry picker. They engaged me as an independent contractor. I asked for the cherry picker. They said no, go ahead and trim the tree. He did not ask for a cherry picker for every tree. No, I understand that. But I'm just saying that's his best case. We're left with drawing the inferences in his favor. So if we're stuck with that, why isn't that a case of secondary assumption of risk rather than primary? Because, again, that would be merely decreasing the risk. And, again, he has stated that in his professional experience with trees, he would use a cherry picker when required. That's in his declaration in the record. Right. That indicates that he says it's not always required. He did not ask for one for this tree. They made it pretty plain before that. We ain't giving you a cherry picker, period, no how, so that he doesn't ask for every tree or bush he trims. That doesn't seem terribly important. I mean, they had made it plain he wouldn't get a cherry picker, that's all. Having been told he wouldn't get a cherry picker, that's all, they called him and asked him to cut this tree. And he could have said no, sorry. Of course he could have. So could any independent contractor. Correct. And an independent contractor, in general, assumes the risk. Again, I want to touch on the non-delegable duty issue that Mr. Fong raised. That, again, was not raised below, and we've stated why it shouldn't be addressed here. But all of the cases cited by the appellant on that subject are ones that discuss the restatement theory that you can retain liability to others and not to the independent contractor that you hire, but, for example, an employee of an independent contractor. A third party who gets hurt because Mr. Taylor blasts the tree, I find that an unreasonable thing to do. Yes, there's a point of control. I mean, obviously, the United States maintains some form of control. That was my only point on it. I mean, if he had removed the tree, if he had blasted it, if he had injured others, the United States would hold him accountable, right? You would say you are not supposed to do that. I suspect they would. Right. However, if you look at the Avila case, which was the collegiate baseball case, there, there was benefit to the college, as explicitly found by the California Supreme Court. They controlled the game, and, nevertheless, primary assumption of risk applied because they did not increase the risk inherent in that sport, even though the allegation was an intentionally thrown beanball and there were various other allegations of wrongdoing by the college. Well, let's say, let's take the Avila situation and say it involves not, not somebody who was beaned, but some pitcher that was injured from the use of an aluminum bat. And they'd say, no, we, we, please stop using metal bats. Use wood bats because they're dangerous. I mean, this is a case, a type of case that gets litigated in the, maybe not on the college level, but certainly younger. Wouldn't that be a case where you, classic secondary comparative analysis opposed to primary assumption of risk? Who is saying, please don't use the aluminum bat? The, the, the baseball team. The baseball team says, we would prefer not to play with an aluminum bat because it's dangerous. And the, and the college says, no, you've got to, this is all we're using. The, the team uses aluminum bat. A pitcher gets injured with an aluminum bat, severe injuries. Isn't that this kind, closer to this kind of case rather than baseball's dangerous, people get thrown at all the time? Given the discussion in the Avila case, I would think that that would still be found to be within primary assumption of risk. They, they take a very expansive view of primary assumption of risk in the baseball context. I'd like to touch just very briefly on the, the evidentiary issues in this case. While those documents were provided in discovery, the plaintiffs, excuse me, the discovery request was that prompted the, the, those documents. While they may be authentic Air Force documents, that doesn't make them admissible on their, on, it may make them authentic, but that doesn't necessarily make them admissible. In fact, the Orr case cited by the appellants, in that instance, the court found that while the documents were authentic, at least one of them still was not admitted because of hearsay. So, and also Rule 26 allows discovery of things that are not admissible as long as they're reasonably calculated to lead to the admissible, to admissible evidence. So the fact that these documents were produced does not necessarily make them admissible, and in any event, the court, the district court reviewed the evidence in the alternative. Given that Mr. Taylor held himself out as an, as an experienced professional, yes, retired tree trimmer, he was in the best position to decide how to do this task. He, as a volunteer, perhaps even more so than a paid employee, can walk away. In, for example, the Preeby case, there was a kennel worker who was paid, but perhaps that person felt that she didn't have a choice but to walk this dangerous dog or rather lose her job. Mr. Taylor had a much easier decision to make. It would be very easy for him to say, sorry, I'm looking at this tree and I can't do this one with the equipment that I have, and so I'm not going to. He chose to assume that risk, and he was the one who will have to live with that decision. Thank you, counsel. Thank you. I'm going to place the court again. Just a couple of points in rebuttal. First, the California cases are really clear. Walking, the fact that a plaintiff could have walked away in the face of the defendant's misconduct in increasing the inherent risk in a dangerous activity, that does not impose or apply or mandate the imposition of a primary assumption of risk doctrine. It simply kicks it into a secondary comparative fault situation. Secondly, as to the Avila case, I will direct the court to the government's own brief. On page 29, footnote 9, it cites Avila for the proposition that primary assumption of risk applied unless student could show school increased inherent risk of activity, even though the school had violated a leak rule prohibiting preseason games. That, Your Honor, means that what the court was concerned about in Avila was a causation issue. That is to say, the alleged misconduct by the school, whether the ‑‑ that is to say, playing preseason games when there's a leak rule prohibiting the school from playing preseason games. Now, the question there was, from the government's own brief, is whether or not the violation of that rule approximately caused the inherent ‑‑ increasing the inherent risk of the activities, getting beamed by a baseball. So that's totally inapplicable to our situation. In here, there is no problem with causation on the ‑‑ under the summary judgment motion criteria. That is to say, there is a fact, it may be disputed, that the government ‑‑ the United States refusal to provide a lift had, in fact, of course, approximately caused Mr. Taylor's fall. As to the issue regarding the admissibility of the documents, I want to remind the court that that's only as to one of the two documents at issue. The district court had admitted into evidence a memorandum which set forth the fact that the golf course had a rule that for volunteers, that to make sure that there are no chemical or physical hazards associated with any jobs that we give, we, the golf course management, give to our volunteers. That was admitted into evidence. And that is a rule that the ‑‑ by imposing that or by instituting that rule, the golf course management, in essence, has negated the ‑‑ its argument of primary assumption of risk. When you institute your own rule and you violate that, as long as it's a proximate cause to the plaintiff's injury, it negates the assumption of risk rule. Thank you very much. Thank you. Thank you both for your arguments. The case of Taylor v. United States will be submitted for decision.
judges: Aldrich, Fernandez, Thomas